THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ALEXANDER MICHAEL TRAINA, Defendant-Appellant.

Fifth District    No. 5—90—0390

Opinion filed June 22, 1992.

Daniel M. Kirwan and Stanley P. Stasiulis, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

William R. Haine, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Defendant, Alexander Michael Traina, was found guilty of two counts of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)) and two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(1)) after a stipulated bench trial. Defendant was sentenced to concurrent 15-year terms of imprisonment for the armed robbery counts and to concurrent terms of 25 years' imprisonment for the aggravated criminal sexual assault counts. Defend-

ant appeals his conviction arguing (1) that he was denied a fair hearing on his motion to suppress statements where the trial court did not remember significant evidence presented in support of the motion, and (2) that his sentence is excessive where the trial court considered improper aggravating factors and gave insufficient weight to defendant's rehabilitative potential. For the reasons that follow, we affirm the decision of the trial court.

Defendant filed a motion to suppress which alleged, *inter alia*, that his confession to police was not knowing, intelligent and voluntary due to their psychological coercion and failure to honor his request for counsel. At the hearing on the motion, Officer William Krause, Sergeant Michael Chosich, Captain Gerald Pinkerton and Police Chief Don Knight, all of the Granite City police department, testified on behalf of the State.

Officer Krause testified that he and Captain Pinkerton had transported defendant from Markham City, Illinois, near Chicago, to Granite City for trial. Shortly after they began the trip to Granite City, defendant "just started talking" about the offenses. Neither officer had asked defendant any prior questions, and when defendant began to talk, Krause immediately read defendant the *Miranda* warnings. Krause stated that defendant acknowledged understanding these rights and told them that while he did not mind talking about the incident, he would not furnish a written statement.

Krause testified that defendant admitted committing the offenses and talked freely to the officers for most of the trip, which lasted about five hours. Defendant never requested counsel, and Krause denied that either he or Pinkerton had made promises or had threatened or coerced defendant in any way. Krause testified that Pinkerton furnished defendant with cigarettes during the trip and that at one point they stopped to eat and gave defendant a hamburger. The officers stopped later for gas and cigarettes for Pinkerton and defendant, but Krause and Pinkerton denied that the four packs of cigarettes given to defendant at that time were in return for defendant's statement. Krause stated that upon reaching the Granite City area, Pinkerton asked defendant to show them where the robbery had occurred and where he had thrown the wallet taken in the robbery. Defendant showed them these locations and the officers then took defendant to the Madison County sheriff's department.

Captain Pinkerton testified in substantial accord with Officer Krause. In Markham City, the Illinois Department of Criminal Investigation (DCI) agents who had arrested defendant informed Pinkerton that defendant was nervous and that he liked cigarettes. Defendant

was security-belted and handcuffed in the back seat during the ride to Granite City. After "just a couple of blocks," defendant started talking about the armed robbery. Pinkerton cautioned Krause to read defendant his *Miranda* rights, and defendant said that he had "heard them before." Pinkerton testified that he was a "chain-smoker" and had given defendant a cigarette every time he himself lit one, but that defendant had started talking prior to being given cigarettes. Pinkerton told defendant when they were approximately half way to Granite City that one of his victims was the police chief's wife.

Sergeant Chosich and Chief Knight, who was then a sergeant, testified that they had interviewed defendant soon after he arrived at the Madison County jail on May 27, 1987. Knight furnished defendant with a constitutional-rights-and-warnings form, which defendant read, initialed and signed. Chosich stated that defendant had agreed to give a written statement and never requested counsel. Both Chosich and Knight testified that defendant was never threatened or abused in any way.

Chief Knight further testified that either Pinkerton or Krause had told him that defendant smoked, and Knight shared his cigarettes with defendant during the hour-long interview. When recalled by the State, Knight testified that he had no independent recollection of whether defendant had said, "Maybe I need a lawyer."

Defendant testified that he had been arrested on May 26, 1987, as he left his motel room in the Chicago area. Three or four detectives had pulled up in a car, pointed guns at him, and thrown him on the ground. Defendant stated that the detectives "[s]tuck pistols in my head and told me not to breathe because they were going to blow my brains out if I breathed." Defendant stated that he was "tossed in the car," told he was under arrest, handcuffed and taken to DCI headquarters in Hazel Crest. Defendant testified that he was "never arrested so violently," and that this arrest had been "totally different from anything that's ever happened."

Concerning his interview with DCI officers, defendant testified as follows:

> "They told me that the Chief of Police's wife in Granite City was an alleged victim in this case that they were looking for and Granite City had a bad reputation for abusing witnesses and that they had heard about the reputation down there already. And they, you know, they said you better, it's kind of rugged because it is the Chief of Police's wife. So it is a heavy-duty thing.

* * *

He said they had a reputation for manhandling people, you know, working people over in Granite City. He said they had heard about it down there, in Hazel Crest. They heard about some of the things that happened to some of the accused in Granite City. And that, you know, he said if you cooperate with them, they would look at it differently because—that you should worry because there's the Chief of Police's wife up there and they are really pepped up about it. It's a big deal to them."

Defendant stated that he was "rattled" and "really intimidated, almost to the state of shock." Defendant further described himself as "really shaken" and "scared by everything that happened." Defendant had requested cigarettes during the DCI interview and was brought two packs of his brand and a cup of coffee. From DCI headquarters, defendant was transported to the Markham City jail. Following a court appearance, Granite City police picked defendant up at 10:30 a.m. the next morning and shackled his hands and feet.

Defendant testified that at some point one of the Granite City officers read him his rights. Defendant stated that he might have rambled during the trip to Granite City, explaining: "I was scared. I talked—if I get real, real nervous, I talk. I'll ramble just to keep talking, almost trying to make them calmer. If I'm keeping conversation going with them, they're not going to get hostile." Defendant stated that he did not request counsel from the transporting officers because he "was trying to placate them."

Defendant testified that at the Madison County jail, almost immediately after Knight entered the interview room, defendant told him, "You know, I think I should talk to a lawyer." Defendant stated that Knight and Chosich did not honor his request but "kept ignoring" the statement.

In ruling on the motion, the trial court, responding to defense counsel's argument that DCI agents had told defendant that the Granite City police had a bad reputation and that here one of the victims was the wife of their police chief, stated: "I don't remember Mr. Traina ever saying anything about being told anything about this involving the Chief of Police's wife in his testimony. I don't remember him saying that. I will refresh myself from the record if he did." The court then rejected the argument that the offers of cigarettes to defendant constituted coercion and found that there were no overt acts by the Granite City police that would have corroborated defendant's claims of psychological coercion based upon the DCI agents' actions and statements. The court added that it did not believe "such

statements were made" and ultimately denied defendant's motion to suppress.

At the stipulated bench trial, the State outlined the following evidence: Debbie May would testify that on August 22, 1986, she was working at P.H. Hair Productions in Granite City, cutting the hair of Mrs. Joyce Harris, when defendant entered the shop, robbed her and Mrs. Harris at gunpoint, bound them both and took her into a back room where he placed his penis in contact with her anus and made her perform fellatio upon him until he ejaculated, some of which went on the floor. Don Knight would testify that he received a report from DCI in Chicago that a man by the name of Alexander Traina was wanted in several jurisdictions for similar offenses. Knight was sent a picture of defendant, which was placed in a photographic lineup on May 26, 1987, and defendant was positively identified by Mrs. Harris and Ms. May as the person that committed the offenses against them.

The State would further introduce the testimony of Dennis Aubuschon from the Fairview Heights Crime Lab, who would testify that the seminal material found at the scene could have originated from defendant. Tina Lambert, an employee of the Ho-Hum Motel in Collinsville, would produce records of the motel's registration showing that defendant had stayed there on August 18 and September 8, 1986.

The State would also offer testimony concerning defendant's oral confession to Officers Krause and Pinkerton, as well as testimony concerning the interview conducted by Officers Knight and Chosich in which defendant signed a written statement giving, in greater detail, his admission to the offenses. Defendant stipulated to all the evidence outlined by the State, subject to the condition that the oral and written confession evidence be considered by the trial court over defendant's objection.

The court stated that it would consider the stipulated evidence in its entirety and overruled defendant's objection to the confession evidence based upon its "prior ruling that the confession and admissions made by the Defendant are admissible and were not improperly obtained." The court then found defendant guilty on all counts.

Defendant argues that he was denied a fair hearing on his motion to suppress because the trial court did not remember, and thus did not consider, significant evidence presented in support of the motion. In ruling on defendant's motion, the court stated that it did not remember defendant "ever saying anything about being told anything about this involving the Chief of Police's wife in his testimony." The crux of defendant's motion to suppress statements was that he had

been psychologically coerced into giving the statements because DCI officers in Markham City had told him that a victim in the offenses was the wife of the police chief of Granite City and that the Granite City police, who had a reputation for "manhandling" defendants, were very "pepped up" over the case and defendant should therefore cooperate.

In *People v. Bowie* (1976), 36 Ill. App. 3d 177, 180, 343 N.E.2d 713, 715, the reviewing court held that where the record affirmatively indicated the trial court, in a bench trial, did not remember or consider the crux of the defense when entering judgment, the defendant did not receive a fair trial. If here, as in *Bowie*, the trial court, sitting as a trier of fact, did not consider all the matters in the record before rendering its decision, it was error. However, it does not necessarily follow that the result reached in *Bowie*, reversal and remand for a new trial, is the appropriate remedy in the instant case. Here, even if the trial court erred in not suppressing defendant's statements because the court failed to consider all of the relevant testimony in ruling on the motion, reversal is not automatic.

Under *Arizona v. Fulminante* (1991), 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246, the improper admission of involuntary statements can be harmless error. Where an involuntary statement was admitted at trial, a reviewing court may affirm the conviction if the admission of the statement is determined to be harmless error beyond a reasonable doubt. (*Fulminante*, 499 U.S. at 310-12, 113 L. Ed. 2d at 331-33, 111 S. Ct. at 1265-66; *People v. Toran* (1991), 219 Ill. App. 3d 991, 995, 580 N.E.2d 595, 598.) The determination of harmless error must be analyzed considering the particular facts of each case and considering the record as a whole. Error is harmless where a reviewing court can safely conclude that a trial, without the error, would produce no different result. *People v. Carlson* (1992), 224 Ill. App. 3d 1034, 1041, 586 N.E.2d 1368, 1373; *People v. Myles* (1985), 131 Ill. App. 3d 1034, 1044, 476 N.E.2d 1333, 1340.

■ In the case at bar, defendant stipulated that one of the victims, Debbie May, would testify that he had robbed her and the other victim at gunpoint, bound them both, placed his penis in contact with her anus and made her perform fellatio upon him. Defendant additionally stipulated that both victims had identified his picture in a photographic lineup, that laboratory tests showed seminal material found at the scene could have come from defendant and that motel records showed that he had stayed in the area shortly before and after the offenses occurred. We therefore find that even if defendant's statements were improperly admitted, due to the overwhelming amount of

other inculpatory evidence presented at the stipulated bench trial, their admission did not affect the outcome of the case and constituted harmless error. See *Carlson*, 224 Ill. App. 3d at 1041, 586 N.E.2d at 1373-74.

■ The defendant next argues that his sentence is excessive because the trial court "placed undue weight upon aggravating factors based on its speculation over defendant's psychological motives for the crimes" and gave insufficient weight to defendant's rehabilitative potential based upon his lack of any significant prior criminal history. However, the sentence imposed by the trial court will be upheld on review absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153-54, 368 N.E.2d 882, 883; *People v. Palmer* (1989), 188 Ill. App. 3d 414, 429, 545 N.E.2d 743, 755.) The trial court's judgment is given great weight and deference because it is in the best position to make a reasoned judgment as to a sentence which balances the need to protect society and to rehabilitate the offender. A reviewing court will not substitute its judgment for that of the trial court merely because it might have balanced the sentencing factors differently. (*People v. Rogers* (1986), 141 Ill. App. 3d 374, 382, 490 N.E.2d 133, 139.) Furthermore, a trial court may properly consider nonstatutory aggravating factors (*People v. Floyd* (1987), 160 Ill. App. 3d 80, 88, 512 N.E.2d 1378, 1384) and may look not only at the facts of the crime but may search anywhere within reasonable grounds for other facts which would tend to aggravate or mitigate the offense, without being strictly bound by rules of evidence which apply to findings of guilt. *People v. Heredia* (1989), 193 Ill. App. 3d 1073, 1082-83, 550 N.E.2d 1023, 1029.

The presentence investigation report considered by the trial court in sentencing revealed that defendant, age 45, had a 1967 conviction for disorderly conduct and a 1972 conviction for deceptive practices. The report also indicated that defendant had worked as a hair dresser for most of his life, had been divorced three times and had been treated for manic depression at a State hospital in 1978. In sentencing defendant, the trial court stated, *inter alia*, as follows:

> "We basically here have two offenses. We have an Armed Robbery which this Defendant, armed with a weapon, goes not to a liquor store, to a bank, anywhere else. Goes to a hairdresser's beauty shop. *** It's certainly not where males would be where people would be able to defend themselves. It seems like this Defendant sought out a place where, because of the presence of females, *** [he would] not meet the type of resistance which he obviously didn't want to meet. Having done that,

when he committed the Armed Robbery, he protects himself further and humiliates the victims by binding them to, I assume, aid in his escape. I think an aggravating situation. The man is armed to begin with. And goes through these additional steps.

And then after that [armed robbery] is over, he proceeds to his other criminal activity, which being not one but two sexual assaults on one of these victims.

And the Court takes that series of events and the way they were committed in this particular case as being aggravating. As being calculated to satisfy, for whatever reason, his feelings outright at that point against women. I think that's why he chose his victims and why he did what he did. I think that's what is exceptionally aggravating about this particular incident.

Whatever the reason for that, certainly legal excuses have not been presented and I don't think the Court has sufficient basis to give much basis to *** [defendant's history of mental illness] as a mitigating factor as to whether he was under that condition when this happened. Although I think probably someone with his background led to this particular victim and his particular acts in this case.

The victim has received, not only has her privacy been invaded, physically assaulted, but certainly has mental scars from this as does the victim who went through the armed robbery. Anyone who has a gun pointed at them and is bound certainly would have those scars."

Defendant contends that the court's "speculations" about defendant's motives for the crimes were neither reasonable nor proper inferences from the record and thus constituted improper aggravating factors. We do not agree. Defendant's written statement, which was admitted at trial, reads in part: "I was in the Granite City area looking around for a place to rob. I had been looking around for about two hours. Before I decided to hit P & H Hair, I had picked another place right down the street. I decided P & H looked safer or better." Based upon this statement, we believe it was reasonable for the court to infer that defendant was motivated to rob P & H Hair because he believed that the two women at the business would not offer resistance.

Additionally, impressions about the individual being sentenced are proper factors for the court to consider in determining the appropriate sentence, as are all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect

of his life relevant to the sentencing proceeding. (See *People v. Ward* (1986), 113 Ill. 2d 516, 527-29, 499 N.E.2d 422, 426-27, *cert. denied* (1987), 479 U.S. 1096, 94 L. Ed. 2d 168, 107 S. Ct. 1314; see also *Heredia*, 193 Ill. App. 3d at 1083, 550 N.E.2d at 1029 (other factors from which an appropriate sentence may be deduced include abnormal or subnormal tendencies, natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and something of his life, family, occupation, and criminal record).) Therefore, in the case at bar, we cannot say that the trial court's impressions of defendant and the stimuli which motivated him to commit the offenses were improper or unsupported by the record.

Defendant did not receive extended or consecutive terms or even the maximum statutory sentence for a Class X felony of 30 years, but he received concurrent terms of 15 years' imprisonment for each armed robbery and concurrent terms of 25 years' imprisonment for the two counts of aggravated criminal sexual assault. The seriousness of a crime is an important factor to be considered (*Heredia*, 193 Ill. App. 3d at 1083, 550 N.E.2d at 1029), and a defendant's potential for rehabilitation is entitled to no greater weight than the seriousness of the offense. (*People v. Parker* (1989), 192 Ill. App. 3d 779, 789, 549 N.E.2d 626, 633.) Further, where, as here, an offense has been exacerbated by needless additional intrusions on the physical integrity of the victims, a sentence beyond the minimum, even in the absence of a prior felony record, is not erroneous. (*People v. Piontkowski* (1979), 77 Ill. App. 3d 994, 997, 397 N.E.2d 36, 38.) Thus, where the sentence the trial court imposed was within the statutory limits, we cannot say that the court abused its discretion.

Accordingly, for all of the above reasons, the judgment of the circuit court is affirmed.

Affirmed.

GOLDENHERSH, P.J., and WELCH, J., concur.